IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| IN THE MATTER OF: ) | |
| ) | CASE NO. BK07-42271-TLS |
| GARY and JOYCE BURIVAL, a/k/a B & B ) | |
| FARMS, a/k/a BURIVAL FARMS, ) | CH. 11 |
| ) | |
| Debtor(s). ) | |
| IN THE MATTER OF: ) | |
| ) | CASE NO. BK07-42273-TLS |
| RICHARD BURIVAL and PHILLIP ) | |
| BURIVAL, a/k/a BURIVAL BROTHERS, ) | CH. 11 |
| a partnership, ) | |
| ) | |
| Debtor(s). ) | |

## **MEMORANDUM**

Hearing was held in Lincoln, Nebraska, on May 7, 2008, on the motion by the conservator of the estate of Rosie Pritchett to allow a claim as an administrative expense (Fil. #367), and objections by the debtors (Fil. #468) and the committee of unsecured creditors (Fil. #469). William L. Needler appeared for the debtors; Michael R. Snyder appeared for the conservator; John M. Guthery appeared for the creditors' committee; Daniel A. Fullner appeared for Troy Judge; Jeffrey P. Galyen appeared for Terry Steskal; Wayne E. Griffin appeared for James Maly; and Jerry L. Jensen appeared for the United States Trustee. The parties have filed briefs on the issue and the matter is now ready for decision. This memorandum contains findings of fact and conclusions of law required by Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52. This is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(B).

As discussed below, I find that the conservator is entitled to an administrative expense claim for the prorated annual rental amount for the post-petition period from the filing date until the date of lease rejection, plus interest and attorneys' fees.

In March 2007, the four individual debtors entered into a three-year lease of cropland and hay ground with Loretta Roehrich as conservator of the landowner Rosie Pritchett. For crop years 2007 and 2008, the annual rent was set at $166,129.00 per year, with $75,329.78 due on April 1st of each year and $90,799.22 due on December 1st of each year. For crop year 2009, the annual rent increased to $178,037.00, with $82,618.50 due on April 1st and $95,418.50 due on December 1st. The term "crop year" is not defined in the lease, but the lease is for three years with each year commencing March 1st and ending on the last day of February.

On November 29, 2007, the debtors filed their Chapter 11 bankruptcy petitions. They rejected the Pritchett lease on March 19, 2008, which was within the 120-day window established in 11 U.S.C. § 365(d)(4)(A). The movant seeks administrative expense status under 11 U.S.C.

§ 365(d)(3),[1] which directs the trustee (or debtor in possession) to timely perform all of the debtors' obligations under any unexpired lease of nonresidential real property until the lease is assumed or rejected, for the rent accruing post-petition and pre-rejection, specifically the $90,799.22 payment due December 1, 2007, plus interest as provided for in the lease. Because the lease also requires the debtors to indemnify the landlord for expenses and costs incurred by the landlord as a result of the debtors' failure to perform any of the lease terms and conditions, the movant also requests an administrative expense claim for her attorneys' fees and costs prior to the rejection date. The debtors and the committee of unsecured creditors object to the request, contending that the rent claim is simply treated as an unsecured claim for pre-petition debt and is not entitled to administrative expense status.

The issue is whether the full amount of the December rent payment constitutes an "obligation[] of the debtor . . . arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected[.]" The parties have incompatible views of when the rental obligation "arose."

The creditors' committee argues that the rent obligation came into existence when the lease contract was entered into and it therefore accrued prior to the petition date, although it became due after that date. For that reason, the rent should be prorated between the pre-petition and post-petition periods with the result that an administrative expense is awarded only for the debtors' post-petition use of the leased property. The committee asserts that the lessor in this case would be entitled to an administrative expense claim only for the two days between the petition date and the rent due date. The remainder of the $90,799.22 would be a pre-petition unsecured claim. Moreover, the committee argues, the rental value of the land is not constant over the course of a year, and because the property was more valuable during the pre-petition growing season than it was during the post-harvest, post-petition period, the amount of the allowed administrative expense should be something less than a per diem amount of the annual rental.

---

[1] § 365. Executory contracts and unexpired leases

. . .

(d)(3) The trustee shall timely perform all the obligations of the debtor, except those specified in section 365 (b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503 (b)(1) of this title. The court may extend, for cause, the time for performance of any such obligation that arises within 60 days after the date of the order for relief, but the time for performance shall not be extended beyond such 60-day period. This subsection shall not be deemed to affect the trustee's obligations under the provisions of subsection (b) or (f) of this section. Acceptance of any such performance does not constitute waiver or relinquishment of the lessor's rights under such lease or under this title.

Under § 1107, the rights and obligations of a trustee fall upon a debtor in possession.

-2-

The debtors likewise argue that the land provided little or no economic benefit during the post-petition, pre-rejection period because that time frame was after harvest and before planting. They also argue that the land has been leased to new tenants for the 2008 crop year at what the debtors believe to be a higher rate than they were paying, so they suggest that the post-petition, pre-rejection claim should be reduced by the amount of the increased rent. Finally, the debtors argue that the lessor is partially responsible for her own damages because she objected to the debtors' earlier motion to assume this lease. With their latter two arguments, the debtors appear to be conflating the request for an administrative expense claim with a claim for damages for breach of contract under § 365(g)(1).

Both objecting parties bring "benefit to the estate" into their discussions. "Benefit to the estate" is a concept relevant to a § 503(b)(1) analysis of whether a creditor is entitled to an administrative expense for the actual, necessary costs of preserving the estate. Section 365(d)(3) specifically excludes consideration of § 503(b)(1), however, so for purposes of this decision, "benefit to the estate" is immaterial. The movant is entitled to an administrative expense for rent without regard to a demonstration of benefit to the bankruptcy estate under § 503(b)(1). *In re S. Lincoln Med. Group, P.C.*, 2008 Bankr. LEXIS 468 (Bankr. D. Neb. Feb. 21, 2008); *In re Brewer*, 233 B.R. 825, 829 (Bankr. E.D. Ark. 1999); *In re Liberty Outdoors, Inc.*, 205 B.R. 414, 417 (Bankr. E.D. Mo. 1997); *In re Samuel Rubens*, Case No. BK95-81111 (Bankr. D. Neb. Mar. 5, 1996).

Where the resolution of a question of federal law turns on a statute and the intention of Congress, the court looks first to the statutory language. *Blum v. Stenson*, 465 U.S. 886, 896 (1984). "It is well established that 'when the statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms.'" *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.*, 530 U.S. 1, 6 (2000)). If that language is unclear, then the court must resort to legislative history in an attempt to divine legislative intent. *Blum v. Stenson*, 465 U.S. at 896. "[T]he meaning of statutory language, plain or not, depends on context." *Pelofsky v. Wallace*, 102 F.3d 350, 353 (8th Cir. 1996) (quoting *Brown v. Gardner*, 513 U.S. 115, 118 (1994)).

Section 365(d)(3) requires continued performance of the debtors' obligations under the lease until the lease is assumed or rejected. *Adelphia Bus. Solutions, Inc. v. Abnos*, 482 F.3d 602, 606 (2d Cir. 2007); *Bala v. Kaler (In re Racing Servs., Inc.)*, 340 B.R. 73, 77 (B.A.P. 8th Cir. 2006). "[Section] 365(d)(3) makes clear that the debtor must perform all obligations owing under a lease – particularly the obligation to pay rent at the contract rate – until the lease is rejected." *Pacific Shores Dev., LLC v. At Home Corp. (In re At Home Corp.)*, 392 F.3d 1064, 1068 (9th Cir. 2004). "The simplicity of [interpreting § 365(d)(3) as a bright-line rule] prevents delays and disputes caused by uncertainty over whether the provision applies to any given lease obligation." *K-4, Inc. v. Midway Eng'd Wood Prods., Inc. (In re TreeSource Indus., Inc.)*, 363 F.3d 994, 997 (9th Cir. 2004) (interpreting lease provision requiring lessee to remove its fixtures, equipment, and improvements from the premises upon lease termination as a damages claim, not an administrative expense claim). "If the trustee fails to perform a lease obligation, the plain meaning of § 365(d)(3) serves to eliminate disputes over whether the claim arising from that nonperformance is entitled to

-3-

administrative priority, and thus advances the interest of resolving bankruptcy cases expeditiously." *Id.*

While the statute's purpose is not disputed, its applicability certainly is. Some courts have found § 365(d)(3) ambiguous as to certain types of lease obligations. *See, e.g.*, *Newman v. McCrory Corp. (In re McCrory Corp.)*, 210 B.R. 934 (S.D.N.Y. 1997) (concerning debtor's obligation to pay real estate taxes); *Nat'l Terminals Corp. v. Handy Andy Home Improvement Ctrs., Inc.*, 222 B.R. 149 (N.D. Ill. 1997) (same); *Child World, Inc. v. The Campbell/Massachusetts Trust (In re Child World, Inc.)*, 161 B.R. 571 (S.D.N.Y. 1993) (same); *In re Ames Dep't Stores, Inc.*, 306 B.R. 43 (Bankr. S.D.N.Y. 2004) (ruling that lessor's administrative claim for monthly rent should be prorated to the date of rejection); *In re Learningsmith, Inc.*, 253 B.R. 131 (Bankr. D. Mass. 2000) (real estate taxes); *In re Victory Markets, Inc.*, 196 B.R. 6 (Bankr. N.D.N.Y. 1996) (same). *See also Vause v. Capital Poly Bag, Inc. (In re Vause)*, 886 F.2d 794 (6th Cir. 1989), in which the Sixth Circuit Court of Appeals, in a case to determine a lessor's claim for rent as lease termination damages under § 502(b)(6)(B), held that a farm debtor's annual rent payment, due four days after the petition date, should be prorated into pre-petition and post-petition amounts and the lessor's claim for the pre-petition amount should be allowed. In doing so, the court ruled that statutory language as to the amount of rent "due" under the lease was ambiguous.

With regard to a debtor's regular monthly rental obligations, payable in advance, two circuit courts have ruled that § 365(d)(3) is unambiguous. *Koenig Sporting Goods, Inc. v. Morse Road Co. (In re Koenig Sporting Goods, Inc.)*, 203 F.3d 986 (6th Cir. 2000); *HA-LO Indus., Inc. v. CenterPoint Prop. Trust*, 342 F.3d 794 (7th Cir. 2003).[2] Lower courts, however, tend to find ambiguity in the statutory language. *See, e.g., Gwinnett Prado, L.P. v. Rhodes, Inc. (In re Rhodes, Inc.)*, 321 B.R. 80 (Bankr. N.D. Ga. 2005) (holding that § 365(d)(3) is ambiguous and the debtor's obligation to pay rent "arises" at the time its liability on that obligation becomes fixed and unalterable); *In re Ames Dep't Stores, Inc.*, 306 B.R. 43 (Bankr. S.D.N.Y. 2004) (finding § 365(d)(3) to be ambiguous and the lessor entitled only to the prorated pre-rejection portion of the rent); *In re NETtel Corp., Inc.*, 289 B.R. 486 (Bankr. D.D.C. 2002) (same); *In re Travel 2000, Inc.*, 264 B.R. 444 (Bankr. W.D. Mich. 2001) (same).

The plethora of cases interpreting § 365(d)(3) demonstrates the statute's ambiguity. *El Paso Prop. Corp. v. Gonzales (In re Furr's Supermarkets, Inc.)*, 283 B.R. 60, 66 n.8 (B.A.P. 10th Cir. 2002) ("The existence of a split in the circuits in the interpretation of § 365(d)(3) is, in itself, evidence of the ambiguity in the language.") (citing *State Ins. Fund v. S. Star Foods, Inc. (In re S. Star Foods, Inc.)*, 144 F.3d 712, 715 (10th Cir.1998). Given the weight of caselaw on all sides of the issue, I find the language of § 365(d)(3) to be unclear and ambiguous.

Reference to the scant legislative history of the statute indicates it was designed to protect lessors of space in shopping centers and was drafted with that business model in mind. According

---

[2]Interestingly, both *Koenig* and *HA-LO* note that had the debtors rejected their leases prior to the due date for their rent payments, they would not have been obligated to pay for that month.

-4-

to legislative statements in the Congressional Record,[3] § 365(d)(3) was intended to ensure that lessors receive current payments for current services:

> This subtitle contains three major substantive provisions which are intended to remedy serious problems caused shopping centers and their solvent tenants by the administration of the bankruptcy code . . . . A second and related problem is that during the time the debtor has vacated space but has not yet decided whether to assume or reject the lease, the trustee has stopped making payments under the lease. In this situation, the landlord is forced to provide current services – the use of its property, utilities, security, and other services – without current payment. No other creditor is put in this position. In addition, the other tenants often must increase their common area charge payments to compensate for the debtor. The bill would lessen these problems by requiring the trustee to perform all the obligations of the debtor under a lease of nonresidential real property at the time required in the lease. This timely performance requirement will insure that debtor-tenants pay their rent, common area, and other charges on time pending the trustee's assumption or rejection of the lease.

130 Cong. Rec. S8887, 8895 (daily ed. June 29, 1984) (statement of Sen. Hatch).

Given this understanding of the congressional intent behind this section of the Bankruptcy Code, courts follow either a "proration" approach or a "performance date" approach in deciding to what extent post-petition, pre-rejection rent or tax payments qualify as administrative expenses. The distinction has been summarized by the Arizona bankruptcy court as follows:

> The issue [of when a lease "obligation" arises] has arisen most often with respect to tenants' obligations to pay rent and real property taxes. The courts that have analyzed these issues have generally split into two approaches: the "accrual" approach and the "billing date" approach. At least with respect to property taxes, the accrual or "proration" approach looks to when the taxes accrued. Those that accrued prepetition are not regarded as being within the scope of § 365(d)(3) even if the debtor/tenant is billed for them within that period, because these courts conclude its intent was not to elevate prepetition obligations to administrative priority status. The concept of "accrual" apparently derives from accounting principles rather than from the language of the Code, which uses the term "arise" rather than "accrue." The billing date or "performance date" approach instead looks to the date the lease requires the tenant to make the payment for rent or taxes, regardless of when they

---

[3] "No Senate report or House report was submitted with the legislation, nor did the House conference report contain a joint explanatory statement. All we find in the Congressional Record are statements by legislators. Senator Hatch was apparently the only legislator to address what would become § 365(d)(3)." *Child World, Inc. v. The Campbell/Massachusetts Trust (In re Child World, Inc.)*, 161 B.R. 571, 575 n.6 (S.D.N.Y. 1993).

>   accrued. The terms of the lease, therefore, determine when the "obligation" arises, irrespective of when an accountant might deem the expense for the obligation to have accrued.

*In re Designer Doors, Inc.*, ___ B.R. ___, 2008 WL 2445090, at *4 (Bankr. D. Ariz. June 17, 2008) (footnotes omitted). *Compare El Paso Prop. Corp. v. Gonzales (In re Furr's Supermarkets, Inc.)*, 283 B.R. 60 (B.A.P. 10th Cir. 2002) (stating that proration approach protects landlords from becoming involuntary creditors, while not elevating pre-petition rent to an administrative expense)[4] and *In re Handy Andy Home Improvement Ctrs., Inc.*, 144 F.3d 1125 (7th Cir. 1998) (holding that property taxes payable by the debtor should be prorated into pre- and post-petition amounts, as the pre-petition property taxes were akin to "sunk costs" for which the debtor would not be liable) *with HA-LO Indus., Inc. v. CenterPoint Prop. Trust*, 342 F.3d 794 (7th Cir. 2003) (finding that debtor's monthly rent obligation arose entirely post-petition and pre-rejection, so § 365(d)(3) required payment of the full month's rent, not simply a prorated amount for the three days the debtor occupied the premises)[5] and *CenterPoint Prop. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 268 F.3d 205 (3d Cir. 2001) (regarding whether taxes billed by the landlord post-petition and pre-rejection were subject to § 365(d)(3)), in which the court said:

>   The clear and express intent of § 365(d)(3) is to require the trustee to perform the lease in accordance with its terms. To be consistent with this intent, any

---

[4] In *Furr's*, the B.A.P. ruled that the debtor's quarterly rent, payable in arrears, should be prorated because the lease obligations arise as they accrue, not when they are billed. At the time, the Seventh Circuit followed this approach, while the Third, Sixth, and Ninth Circuits followed the performance date approach. The B.A.P. relied on the Seventh Circuit's articulation in *Handy Andy* that § 365(d)(3)'s purpose is to provide lessors with full and timely payment for post-petition services while not giving them favored treatment for pre-petition debts. 283 B.R. at 66-67. *See also CenterPoint Prop. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 268 F.3d 205, 213 (3d Cir. 2001) (Mansmann, J., dissenting), in which the dissenting judge opined that the majority's performance date rule "elevates the accident or artifice of the billing date above the economic reality of the accrual, and thereby inappropriately burdens the administration of the bankrupt estate and unfairly favors landlords over similarly situated pre-petition creditors." The dissent also distinguished its own reliance on *Handy Andy*, which dealt with property taxes, from the majority's reliance on *Koenig Sporting Goods*, which dealt with advance rent, by observing "it would seem that parceling a continuing obligation into monthly increments is far less subversive of statutory policies than aggregating a year or more of accrued debt for priority purposes." 268 F.3d at 214.

[5] In *HA-LO*, the circuit court distinguished its ruling in *Handy Andy*, in which property taxes were prorated into pre- and post-petition amounts. It said the pre-petition property taxes were akin to "sunk costs" for which the debtor would not be liable, while the rent due under HA-LO's lease was an administrative cost for consumption of a resource during the case and therefore must be paid. 342 F.3d at 798-99.

> interpretation must look to the terms of the lease to determine both the nature of the "obligation" and when it "arises." If one accepts this premise, it is difficult to find a textual basis for a proration approach. On the other hand, an approach which calls for the trustee to perform obligations as they become due under the terms of the lease fits comfortably with the statutory text.

*Id.* at 209. The court went on to explain that "[u]nmatured rights to payment under a lease exist from the date the lease is executed, and no right to payment would ever arise under an unexpired lease after the order for relief" if the debtor's "obligation" is held to arise at the same time as the lessor's "claim."

As is evident from the preceding discussion, there is an abundance of caselaw concerning § 365(d)(3)'s interpretation *vis-à-vis* commercial lease contracts. No reported cases, however, address the situation present in this case where the parties followed a standard practice of agricultural leasing to accommodate the industry's uneven distribution of income and expenses by agreeing to semi-annual rent payments. Cases involving rent payable for a term other than monthly are considered by most courts to be the exception rather than the norm, and are to be dealt with on a case-by-case basis. *In re CCI Wireless, LLC*, 279 B.R. 590, 594 (Bankr. D. Colo. 2002).

In this regard, the Sixth Circuit Court of Appeals' reasoning in *Vause v. Capital Poly Bag, Inc. (In re Vause)*, 886 F.2d 794 (6th Cir. 1989), is relevant. Although it was decided under § 502(b)(6) rather than § 365(d)(3), it appears to be the only reported case in which farm lease payments, payable in arrears, were at issue in the context of determining the amount of a claim.

In *Vause*, the debtors' lease of farm ground required annual rental payments on December 1st of each year. They filed a Chapter 11 petition and a motion to reject the lease on November 27th. The lessor filed a claim under § 502(b)(6) for 361 days of pre-petition rent. The appellate court examined the meaning of the term "due under the lease" as used in § 502(b)(6). In doing so, the appellate court reversed the bankruptcy court's and district court's ruling that no rent was "due" under the lease because the obligation did not become due and payable until after the petition date. The Court of Appeals relied on the stated congressional intent to compensate lessors for their actual damages while simultaneously limiting their speculative damages for future rent, in order to preserve some recovery for other creditors. 886 F.2d at 801-02. This was characterized as a "limited sacrifice" by the lessors, as a happy medium that permits them some recovery while facilitating the debtor's reorganization. *Id.* at 802. The court noted that the interpretation by the bankruptcy court and district court in a manner that "eliminates past damages based on the fortuity of the filing date does not comport with the balance Congress has attempted to strike between the affected parties." *Id.* at 803. While the Court of Appeals agreed with the proposition that rent becoming "due" post-petition supports a claim, the analysis supports the proration approach rather than the performance date approach.

Under the circumstances of the present case (where the lease is a multi-year lease and annual rent is paid in two installments over the course of the year), the proration approach is the most appropriate manner of resolution. I agree with the well-stated position of the courts that follow the

"current pay for current services" principle in holding that post-petition, pre-rejection rent should be allowed as an administrative expense only for the time of the debtors' post-petition use of the premises. In this case, the administrative expense rent claim will be allowed for the days between the petition date and the rejection date. To hold otherwise would elevate much of the $90,000.00 rent payment from an unsecured pre-petition claim to an administrative expense claim, to the detriment of the estate's other creditors, and would threaten the debtors' ability to successfully reorganize.

These cases were filed on November 29, 2007, and the lease was rejected on March 19, 2007. Accordingly, 111 days accrued from filing to rejection. The annual rental amount during that period of time was $166,129.00, or $455.15 per day. Thus, the amount of movant's administrative claim is $455.15 per day multiplied by 111 days, or $50,521.65.

The movant's attorneys' fees for the post-petition, pre-rejection period are appropriate expenses under § 365(d)(3) if provided for in the lease. *S. Lincoln Med. Group,* 2008 Bankr. LEXIS 468 (Bankr. D. Neb. Feb. 21, 2008); *In re Exch. Res., Inc.*, 214 B.R. 366 (Bankr. D. Minn. 1997); *Rubens*, Case No. BK95-81111 (Bankr. D. Neb. Mar. 5, 1996). In this case, the lease terms provide for the payment of the lessor's expenses arising from the lessees' failure to perform any of the terms and conditions of the lease. Farm Lease Agreement, ¶ 16 (Fil. #166). The lease also provides for the payment of interest at 12 percent per annum on the unpaid balance of rent from the date it is due until it is paid. *Id.* at ¶ 5. *See also Cukierman v. Uecker (In re Cukierman)*, 265 F.3d 846, 852-53 (9th Cir. 2001) (§ 365(d)(3) is limited to obligations arising under the lease; because interest claim was created by statute rather than lease, it was not entitled to administrative priority).

Therefore, the movant is entitled to an administrative expense claim for $50,521.65, representing the amount of annual rent accrued from November 29, 2007, to March 19, 2008; interest at 12 percent per annum on that amount from December 1, 2007, through the date it is paid; and $7,186.64 in attorneys' fees. However, none of this claim shall be paid pending a final determination of the amount of funds available to pay all administrative claims. A separate order will be entered.

DATED: July 9, 2008.

BY THE COURT:

/s/ Thomas L. Saladino
Chief Judge

Notice given by the Court to:
 *Michael R. Snyder
 William L. Needler
 John M. Guthery
 Daniel A. Fullner
 Jeffrey P. Galyen
 Wayne E. Griffin
 United States Trustee

Movant (*) is responsible for giving notice to other parties if required by rule or statute.