IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | CASE NO. BK07-42271-TLS |
| | ) | |
| GARY M. BURIVAL and | ) | CH. 11 |
| JOYCE BURIVAL, | ) | |
| | ) | |
| Debtors. | ) | |
| IN THE MATTER OF: | ) | CASE NO. BK07-42273-TLS |
| | ) | |
| RICHARD BURIVAL and | ) | CH. 11 |
| PHILLIP BURIVAL, d/b/a | ) | |
| Burival Brothers, a partnership, | ) | |
| | ) | **JOINTLY ADMINISTERED** |
| Debtors. | ) | |

## ORDER

Trial was held in Lincoln, Nebraska, on February 24, 2009, on a Motion to Allow Claims as Administrative Expense Claims filed by creditor Thomas J. Welsh (Fil. #404), and a Resistance by Debtors (Fil. #511). At trial, the parties agreed that Debtors' resistance could be treated as an objection to the claims filed by Mr. Welsh. William L. Needler appeared on behalf of Debtors, and Howard T. Duncan appeared on behalf of Mr. Welsh. The parties have now submitted their post-trial written closing arguments, and this matter is ripe for decision.

*Background*

On or about April 1, 2007, Thomas and Christine Welsh, as landlords, and Gary and Joyce Burival, as tenants, entered into a farm lease regarding certain real property located in Holt County, Nebraska. The term of the lease was from April 1, 2007, to December 31, 2007. Debtors agreed to pay $26,575.00 total rent, with $13,287.50 becoming due upon signing the lease, and $13,287.50 to be paid on or before December 1, 2007.[1]

In addition to the leasing of the land for farming operations, the lease contained certain additional rights and obligations. For example, paragraph 4(a) allowed the landlord to enter the land at any reasonable time for repairs, improvements, inspections, and grazing of stalks. The landlords agreed to pay for parts, and the tenants agreed to pay for labor expenses if repairs were needed to motors, pumps, wells, or pivots (¶ 4(b)); tenants agreed to maintain the irrigation systems and equipment in good working condition and to winterize the same (¶ 4(d)); tenants agreed to pay one-half of the expenses to have a third party inspect the systems to ensure they were winterized and in working condition, and to make any necessary repairs (¶ 4(e)); tenants had the right to harvest hay

---

[1] In paragraph 3, the lease refers to the payments being made on April 1, 2006, and December 1, 2006. Presumably, that is a typographical error and the parties meant for the year to be 2007.

on the property until September 1, 2007 (¶ 4(g)); and tenants agreed to fill in the "rig tracks" at the end of the growing season (¶ 4(h)).

Debtors/tenants filed this Chapter 11 bankruptcy proceeding on November 29, 2007. The lease was subsequently rejected, although rejection was not necessary since the lease expired by its own terms on December 31, 2007.

On or about January 3, 2008, Mr. Welsh attended the first meeting of creditors in this case. Mr. Welsh testified that even though he attended that meeting, he was not aware that Debtors had actually filed bankruptcy. He thought the meeting had something to do with whether Debtors were "going to be allowed" to file bankruptcy. In any event, Mr. Welsh came away from the meeting with the understanding that Debtors were having difficulty getting their crops out of the field in various locations, including his own. After hearing that a substantial snowstorm was expected the following week, Mr. Welsh decided to take matters into his own hands and paid for the custom harvesting of the crop on the property he had rented to Debtors. Mr. Welsh caused the harvested grain to be delivered to Cargill Grain Elevator and sold at the then-current market rates. The crop proceeds amounted to $97,000.00. Mr. Welsh turned the proceeds check over to his attorney,[2] who apparently arranged for a joint account between Debtors and Mr. and Mrs. Welsh to be set up at a Great Western Bank branch. Ultimately, those funds were turned over to Debtors for payment to their lender during the course of this bankruptcy proceeding.

Mr. and Mrs. Welsh subsequently filed three proofs of claim in this proceeding. First, they filed a proof of claim (Claim #59) in the amount of $4,400.00 for the expenses for harvesting and trucking the grain to Cargill. Debtors have conceded that Mr. and Mrs. Welsh are entitled to an administrative expense claim for that amount, but assert setoffs and damages. Mr. and Mrs. Welsh's second claim (Claim #60) was in the amount of $13,287.50, for which they claim administrative expense status as a rent payment coming due post-petition but prior to rejection. Mr. and Mrs. Welsh also filed a proof of claim (Claim #58) in the amount of $30,230.59, which contains certain delineated expenses incurred by them due to Debtors' failure to harvest their crop in a timely fashion, as well as other damages under the lease. Mr. and Mrs. Welsh desire for that claim to have administrative expense status.

Debtors object to Claims #58 and #60, and assert various setoffs and damages. In particular, Debtors believe that Mr. Welsh should be sanctioned for violations of the automatic bankruptcy stay.

## *Discussion*

The claims filed by Mr. and Mr. Welsh will each be discussed in turn.

---

[2] Mr. Ronald Temple.

1.    <u>Claim #59 in the amount of $4,400.00</u>.

*"What we've got here is a failure to communicate."*[3]

As indicated previously, Debtors now acknowledge that Mr. and Mrs. Welsh are entitled to an administrative expense claim in the amount of $4,400.00 for harvesting and delivering the crop to Cargill Grain Elevator. However, Debtors assert that the claim should be offset by damages and sanctions for violation of the automatic stay. The only thing clear from the testimony of the parties at trial was that they failed to communicate regarding the need to harvest the 2007 crop before winter weather would make harvesting impossible. Mr. Burival's testimony that he was waiting for inspection of his crop by the crop insurance adjuster simply defies logic. According to the evidence, there was no crop insurance claim pending or any valid reason to suspect that this particular crop could have been subject to a crop insurance claim. Further, the lease (and Burival's right to possession of the leased property) expired on December 31, 2007.

Of course, it is also inconceivable that Mr. Welsh was unaware of the bankruptcy filing when he elected to harvest and sell the crop himself. Mr. Welsh had just attended the first meeting of creditors in this bankruptcy case only a few days before, at which it would have been obvious that a bankruptcy case was pending. Mr. Burival claims he would have been ready to harvest the crop on Mr. and Mrs. Welsh's land within days of the time that Mr. Welsh had already completed the harvest. However, other than Mr. Burival's testimony, there was no evidence that he could have done so. After considering the yields obtained by Mr. Welsh, Debtors no longer object to the administrative expense claim for the cost of harvesting. However, Debtors want this Court to sanction Mr. Welsh for violating the automatic stay for harvesting the crop without Court approval and for selling the crop and retaining the proceeds.

There is no question that Mr. Welsh should have requested bankruptcy court approval before harvesting the crop. However, all indications are that the harvest was done in a proper manner and there was no assertion at trial that Mr. Welsh failed to maximize the yield from the crop. Further, Mr. Welsh testified that he acted on the advice of an attorney and that he moved swiftly in order to save the crop from a big snowstorm that was expected within a matter of days. In fact, by harvesting the crop, Mr. Welsh did preserve it for the benefit of the estate. Accordingly, I find that Mr. Welsh did not intentionally violate the automatic stay by harvesting the crop and will not impose sanctions upon him for doing so.

It is unfortunate that after harvesting the crop Mr. Welsh chose to sell it (again, purportedly on the advice of counsel) rather than just report its location to Debtors. If Mr. Welsh was truly acting to protect the crop for the benefit of the estate, he should have simply delivered it to the grain elevator rather than sell it. Debtors presented evidence establishing that the price Mr. Welsh obtained for the crop was well below the prices Debtors obtained later in the year for the remainder of their 2007 crop. Debtors assert that they have been damaged by more than $13,000.00 as a result

---

[3]Famous quotation from the movie "Cool Hand Luke."

-3-

of Mr. Welsh selling the crop without their consent. Of course, even if Debtors had the ability to harvest the crop before it went down (which is not at all evident), no evidence was presented to establish that Debtors had the ability to store the crop for later sale nor as to the cost of such storage, so it is impossible to determine the exact amount of damage (if any) to Debtors. So, Debtors' claim for damages is denied. However, the bottom line is that Mr. Welsh did violate the bankruptcy stay by exercising self-help and selling the crop. As a sanction for doing so, I find that the Welsh administrative claim (Claim #59) shall be subordinated to all other administrative claims in this case.

To compound matters, rather than just turn the crop sale money over to Debtors, Mr. Welsh put it in a joint bank account with Mr. Burival. For reasons no one could explain, Mr. Burival participated in setting up that account. Thus, contrary to Mr. Burival's assertions, it seems he was not denied access to the proceeds. He was a joint owner of the bank account and did not need intervention by this Court to access those funds. While this Court does not wish to approve of the actions taken by Mr. Welsh, since Mr. Burival participated in setting up the account, I decline to sanction Mr. Welsh for doing so. Debtors' claim for damages and attorney fees is denied.

2.  Claim #60 in the amount of $13,287.50.

This claim represents the second half rent payment due December 1, 2007, under the terms of the lease. Mr. and Mrs. Welsh claim that the entire amount of this payment constitutes an administrative expense claim since it was an obligation under the terms of the lease to be performed by Debtors post-filing and prior to rejection of the lease.

This Court previously decided in this bankruptcy proceeding that another landlord, Loretta Roehrich, Conservator of the estate of Rosie Pritchett, was entitled to an administrative expense claim for the annual rental amount prorated for the number of days post-petition until rejection of the lease. Memorandum and Order dated July 9, 2008 (Fils. #680 and #681). That prior Memorandum analyzed the various approaches to interpreting 11 U.S.C. § 365(d)(3) and determined that under the circumstances where lease payments were due semiannually, a "performance date" approach would artificially elevate pre-petition claims to administrative priority status. That earlier Order is presently on appeal to the Eighth Circuit Bankruptcy Appellate Panel. Using the same approach followed by this Court in connection with the Pritchett claim, a total of 32 days elapsed from the date of bankruptcy filing until expiration of the lease on December 31, 2007. The annual rental amount of $26,575.00 prorated over a 365-day year results in a daily rental accrual of $72.81. When that amount is multiplied by 32 days, the resulting figure is $2,329.92. That is the amount this Court is inclined to award as an administrative expense claim for post-petition rental obligations, with the balance of Claim #60 allowed as a general unsecured claim. Also, since the lease expired on December 31, 2007, and the crop was removed from the field within a matter of days after that, I would not award administrative expense status for any "use" of the land by Debtors after lease expiration. There is no evidence that Mr. Welsh could have made any use of his property during that short period of time in the middle of winter.

However, I am going to defer ruling on this claim pending a determination by the B.A.P. on this Court's earlier decision with respect to the Pritchett claim. Therefore, no portion of this Order shall be final for purposes of appeal until further order of this Court.

3. <u>Claim #58 in the amount of $30,230.59</u>.

Finally, we turn to Mr. and Mrs. Welsh's itemized claim for various expenses. Each itemized expense will be addressed below.

    a. Mr. Welsh claims the total sum of $750.00 to move hay bales from the leased land to another location nearby. Here, we had another failure to communicate. There was simply no evidence that Mr. Welsh asked Debtors to pick up or move the hay before doing so himself. Further, there is no evidence that moving the hay was even necessary other than Mr. Welsh wanted to allow his livestock to graze on the cornstalks on the leased land, and the livestock may very well have grazed on the hay instead. In any event, Mr. Welsh should have communicated with Mr. Burival regarding Mr. Burival's hay before moving it. Mr. Burival complains that Mr. Welsh should be sanctioned for moving the hay and preventing Debtors from having access to it. However, Debtors are the ones who left the hay on the leased land after the expiration of the lease. Further, there is no evidence that Debtors were ever denied access to the hay and acknowledge they were not damaged by the change in location. Accordingly, Mr. Welsh's claim in the amount of $750.00 is denied as are Debtors' claims for sanctions.

    b. Mr. Welsh claims the sum of $872.99 for winterizing the irrigation systems and $571.50 for filling in the rig tracks on the land. There is no dispute that Mr. Welsh is entitled to a claim in those amounts. However, Mr. Welsh is not entitled to an administrative expense claim. Certainly, those items do not benefit the bankruptcy estate. Further, it is not at all clear that those items were to be performed under the terms of the lease post-bankruptcy filing. In fact, if the harvest had been done in a timely fashion, those items would have been, and should have been, done prior to bankruptcy filing. Thus, Mr. Welsh is entitled to general unsecured claims for $872.99 and $571.50.

    c. Apparently, Mr. Welsh borrowed the money to pay Schaaf Irrigation for the winterizing expense of $872.99. Mr. Welsh paid a loan fee to Great Western Bank in Atkinson, Nebraska, in the amount of $100.00. That amount can be included in Mr. Welsh's general unsecured claim for winterization expense.

    d. Mr. Welsh seeks $708.90 for air spreading of fertilizer on grass after harvesting. There is no corresponding obligation under the lease agreement. Thus, this claim is disallowed.

    e. Finally, Mr. Welsh claims that he is entitled to the sum of $27,227.20 as the cost of hay used to feed his cattle due to his inability to let the cattle feed on the cornstalks (which resulted from Debtors' failure to timely harvest). This claim is denied. Mr. Welsh

presented no evidence to support this claim. Further, nothing in the lease required Debtors to harvest the crop by any particular date. Therefore, Mr. Welsh did not have an absolute right to feed his cattle the cornstalks for any length of time. By failing to include a date by which the harvest would be completed and the cornstalks made available to his cattle, Mr. Welsh assumed the risk that weather or other uncertainties would prevent him from doing so. As it turned out, that is exactly what happened.

Accordingly, Mr. and Mrs. Welsh's motion for administrative claim status for Claim #58 in the amount of $30,230.59 is denied and is reduced to a general unsecured claim in the amount of $1,544.49.

IT IS, THEREFORE, ORDERED as follows:

1.      Claim #59 in the amount of $4,400.00 is hereby allowed as an administrative expense priority claim in favor of Thomas J. and Christine Welsh. However, that claim is subordinated to all other administrative expense priority claims;

2.      Claim #60 is deferred at this time as discussed above;

3.      Claim #58 in the amount of $30,230.59 is reduced to a general unsecured claim in the amount of $1,544.49;

4.      Debtors' claims for damages and requests for monetary sanctions are denied; and

5.      This Order shall not be considered final for purposes of appeal until further order of this Court with respect to Claim #60.

DATED: March 26, 2009.

BY THE COURT:

/s/ Thomas L. Saladino
Chief Judge

Notice given by the Court to:
    William L. Needler
    *Howard T. Duncan
    Rick D. Lange
    U.S. Trustee

Movant (*) is responsible for giving notice to other parties if required by rule or statute.